ANNETTE RODRIGUEZ,
  Plaintiff,

v.                                        Case No. 1:17-CV-1147-SCY-LF

RICKY SERNA,
BRANDI CORDOVA,
PATRICIA TRUJILLO,
NANCY "RUSTY" BARCELO,
RICK BAILEY, MATTHEW
MARTINEZ, ANTHONY SENA,
PEDRO MARTINEZ, MARIO
CAETANO, RYAN CORDOVA,
ANDY ROMERO, JOHN
WATERS, BERNIE PADILLA,
in their individual capacities; and
NORTHERN NEW MEXICO
COLLEGE (NNMC) AND THE
NNMC BOARD OF REGENTS,
  Defendants.

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, by and through undersigned counsel, with her First Amended

Complaint, pursuant to the Court's Memorandum Opinion And Order Granting In Part

Defendants' Motions To Dismiss And Motion For Judgment On The Pleadings With Leave To

Amend [Doc. 72].   For her First Amended Complaint, Plaintiff states as follows:

1.      This case arises from Plaintiff's employment as adjunct faculty member by

Defendant Northern New Mexico College (NNMC) beginning in Fall 2012.  Plaintiff's

employment was terminated by non-renewal of an approved contract in 2014.  On multiple

occasions during and after her employment, Plaintiff called attention to improper use of grant

funds and other financial and educational mismanagement.  She attempted to work within the

system to correct problems she observed, but just as in previous instances when employees

reported potential financial malfeasance or otherwise questioned administration actions, NNMC and individual Defendants reacted to her comments, suggestions, and grievances by harassing her, denying her professional opportunities, terminating her employment, defaming her nationally and locally, and otherwise retaliating against her. Defendants' conduct violated Plaintiff's constitutional rights in a manner actionable under 42 USC § 1983, and state claims under statutory and the common law.

**JURISDICTION AND VENUE**

2.      All parties resided in New Mexico at the time of the events on which this Complaint is founded, and the actions and injuries complained of occurred in this state.

3.      This is an action for money damages brought pursuant to the First and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983; the Digital Millennium Copyright Act (17 U.S.C. § 512), the New Mexico Inspection of Public Records Act (NMSA § 14-2 et. seq.) and New Mexico Common law claims.

4.      This Complaint was removed to the federal district court for the District of New Mexico by Defendants.[1]

5.      At the time the Complaint was filed, Plaintiff was a resident of Bernalillo County.

6.      Jurisdiction and venue are proper.

**BACKGROUND FACTS**

7.      Plaintiff Annette Rodriguez is female, Hispanic, and at all times relevant to the Complaint, an out lesbian. Plaintiff suffers from lupus, a chronic autoimmune disease, which can be exacerbated by stress.

8.      Plaintiff earned her undergraduate and master's degree from University of New

---

[1] Jury trial has been requested.

Mexico, and now has a Ph.D. from Brown University. Prior to beginning her Ph.D. studies, Plaintiff worked for worked for six years as an accountant.

9.     Plaintiff was hired by NNMC in Fall 2012 to teach Developmental English and First Year Experience courses on a standard adjunct faculty contract. At the time, Plaintiff had completed her Ph.D. coursework at Brown University, and was working on her doctoral dissertation. She was recruited for employment at NNMC by Defendant Patricia Trujillo.

10.    At times relevant to this Complaint, Defendants were employed by NNMC as follows:

    A.  Defendant Ricky Serna was Vice-President of Institutional Advancement.

    B.  Defendant Brandi Cordova was the custodian of public records and executive assistant to Ricky Serna.

    C.  Defendant Nancy "Rusty" Barcelo was the president of NNMC through July 2015. Defendant Rick Bailey succeeded Barcelo as president of the College in October 2016.

    D.  Defendant Matthew Martinez was a Humanities faculty member and Director of The Northern Pueblos Institute.

    E.  Defendant Patricia Trujillo was a Humanities faculty member and Director of Equity and Diversity.

    F.  Defendant Pedro Martinez was a Provost at the College.

    G.  Defendant Anthony Sena was a Provost at the College.

    H.  Defendant Ryan Cordova was the basketball coach and husband of Brandi Cordova.

    I.  Defendant Mario Caetano was an assistant basketball coach.

J. Defendant Andy Romero was head of the custodial staff.

K. John Waters was head of security.

L. Bernie Padilla was the Director of Human Resources.

11.     At all time during her employment as an adjunct faculty member at NNMC, Plaintiff was successful in her primary role as an instructor, interacted well with her students, and received positive teaching evaluations from her supervisors.

**PLAINTIFF SPEAKS OUT ON MATTERS OF PUBLIC INTEREST AND CONCERN AS AN EMPLOYEE**

12.     Plaintiff's first position with NNMC in Fall 2012, teaching Developmental English and First Year Experience courses, was funded, in whole or part, from a federal Department of Education grant to NNMC.  Toward the end of her first semester teaching, Defendant Patricia Trujillo, who had initially recruited Plaintiff to NNMC, offered Plaintiff an additional position as a grant assistant for a federally-funded program called "*Exito,*" an initiative to improve persistence and graduation rates.

13.     During a subsequent meeting where Trujillo asked Plaintiff to help manage the grant, Plaintiff realized that Trujillo's approach to compliance with generally applicable regulations governing the use of federal grants was questionable, and that Trujillo demonstrated a cavalier attitude to the need for accurate accounting for the multi-year grant.  Based on how she had seen other NMMC employees treated, Plaintiff was reluctant to confront Trujillo directly with her financial concerns, or to place herself in a position where she might be asked to do something she thought was improper. So, on February 28, 2013, Plaintiff emailed Trujillo, offering to take a lead role on programmatic aspects of *Exito*, but omitted financial management and reporting from the areas she proposed take on.  Defendant Trujillo never responded to this email, and began avoiding Plaintiff on the campus.

14.    Plaintiff shared her continuing concerns about the College's use of the *Exito* Grant with her Department Chair Lori Franklin, Humanities Chair David Barton, Provost Anthony Sena, and Defendant Trujillo in writing in 2013 and 2014.

15.    During the 2013 spring semester, Plaintiff was offered three opportunities which she perceived as key to her career development: an offer from Defendant Trujillo to participate in planning for the 2013 Northern Research Conference Committee; an invitation from President Barcelo to the annual spring gathering at her home; and a request from Defendant Trujillo to participate in a team building exercise to plan the forthcoming two years of the *Exito* Grant. Plaintiff declined to participate in these three activities, despite knowing it could hurt her advancement at NNMC, because of her growing concerns that federal grant funds were being misused, misallocated and improperly accounted for, and her reluctance to be associated with those problems.

16.    In her second semester teaching at NNMC, Plaintiff was invited to join a planning committee to help prepare "*Historias*," an annual history conference at the College. Plaintiff put aside her misgivings about participating in the interests of her career. However, she soon noticed similar financial issues that had led her to distance herself from the *Exito* grant. She wrote a letter detailing her concerns and circulated it to committee members.

17.    On Nov. 18, 2013, in a meeting held with the full *Historias* Planning Committee, Plaintiff questioned the propriety of using the Northern Foundation as a shell for the conference finances and also asked for details on funding and granting agencies. She also urged that a treasurer be added to the committee to track the expenditures and revenues. Defendants Trujillo and Matthew Martinez were not amenable to her suggestions and their demeanor and attitude towards Plaintiff changed for the worse.

18.     In early 2014, her second year teaching at the College, Plaintiff was invited by Amy Pena, assistant to Defendant President Barcelo, to join the planning committee of a national history conference -- *Mujeras Activas en Letres y Cambio Social* (hereinafter MALCS) -- that NNMC was hosting.

19.     Plaintiff viewed the invitation as an important milestone for career advancement. The conference had national visibility, and she thought because of this, she would not encounter the financial management problems she had seen previously, and so she accepted.

20.     Plaintiff soon witnessed financial improprieties with the MALCS conference similar to what she when saw on her previous *Exito* Grant committee duties.  On January 7, 2014, Plaintiff requested a meeting with President Barcelo to discuss her concerns.  She was told by Pena that the President's schedule was "extremely busy" and Barcelo would not be able to meet with Plaintiff.

21.     On March 30, 2014, frustrated that her concerns about MALCS were being completely ignored internally, Plaintiff sent a letter to five members of the national executive committee of MALCS expressing concerns about funding and staffing.

22.     On April 16, 2014 Plaintiff, in her capacity as member of the Faculty Senate, attended an "Effective Resources Utilization Committee" (hereinafter "ERUC") meeting at which V.P. Ricky Serna described NNMC Career and Tech programs as "low-enrollment" and proposed cutting the programs, reducing faculty positions and raising tuition.  Plaintiff was shocked and dismayed by this approach, which she considered too drastic.  During the question and answer period, Plaintiff asked how the data was collected and pointed out an error on the displayed spreadsheet. Because of her training and experience as an accountant, Plaintiff requested a copy of the spreadsheet and accompanying presentation for her further review.

23.     On April 21, 2014, Plaintiff drafted and sent a letter to the Board of Regents describing the harm to veterans and other students in the Career and Tech programs if they were cancelled, mentioning the hard work and sacrifices of students, many of whom live below the poverty line.  Making use of her own accounting background, Plaintiff offered reasonable alternatives to Defendant Serna's proposed budget and pointed out his factual inaccuracies. Plaintiff was critical of financial shortfalls for Student Services, Scholarships, and Student Aid and Grants, which she contrasted with substantial increases to Internal Services and Athletic Departments and excessive administrator salaries, ranging between $90,000 to $200,000.

24.     On May 1, 2014, Plaintiff learned that H&H Investigations, a private investigation firm, had been hired by NNMC and had sent employees to the campus during business hours to interview members of the College's staff and faculty for what the investigators described as "an internal investigation," which Plaintiff believed targeted NNMC whistle-blowers.  On that day, Plaintiff emailed the College's Administrators, members of the Board of Regents, and faculty requesting information on H&H Investigators, and whether faculty should cooperate with them. Plaintiff received no response.  On May 2, 2014 she attended a Faculty Senate meeting and sought more information about the H&H investigations from administrators present, including Defendants Ricky Serna, Bernie Padilla, and Anthony Sena.

25.     Around the same time, in a letter to the Board of Regents, Plaintiff also requested detailed information about salary discrepancies and the State's specific appropriations for raises for both fulltime and adjunct faculty because the adjunct faculty had not received any salary increases.  In a follow-up letter to the Board of Regents, Plaintiff suggested budget alternatives and provided information documenting steep increases in administrative salaries.

**DEFENDANTS DISPLAY RETALIATORY ANIMUS TO PLAINTIFF, INCLUDING TERMINATING HER EMPLOYMENT**

26. Defendants retaliated against Plaintiff for her protected speech while Plaintiff was still employed by NNMC by withdrawing her employment contract, and by harassing and defaming her, as follows:

a. In retaliation for her questions and criticisms of financial management for the *Historias* conference, Defendants began spreading insults and disparaging comments about Plaintiff's lesbian sexuality broadly within the college community and with colleagues at other schools, and by falsely accusing Plaintiff of misconduct in meetings with administrators soon after the November 18, 2013 meeting described in paragraph 17.

b. On February 27, 2014, Defendant Patricia Trujillo sent an email addressed to Barcelo, Sena, Padilla, and V.P. Ricky Serna accusing Plaintiff of being "unprofessional, inappropriate and targeting members of the Historias committee." This email did not provide any examples of alleged conduct by Plaintiff, and was in fact false. Trujillo caused copies of her email to be circulated widely within NNMC.

c. On April 14, 2014, Barcelo removed Plaintiff from NNMC's MALCS planning committee for her whistle-blowing on MALCS.

d. On July 11, 2014, President Barcelo sent a letter to the National Association for Chicana and Chicano Studies (a larger association separate from MALCS with membership of over 5,000 professionals nationwide in Plaintiff's field) for the purpose of raising funds for the MALCS conference. Defendant Barcelo's letter characterized the concerns Plaintiff had shared in her correspondence with MALCS Executive Committee as misrepresentations and an effort to undermine the work done at NNMC. Barcelo's letter contended that Plaintiff's email was aimed at

hurting the college and defaming individuals among the faculty and administration, and concluded with a plea for additional registrations and thus further funding for the conference.

27.     In March 2014, Plaintiff was offered a position for the 2014 Summer semester by Lori Franklin, English Department Chair, and Deborah Begel, the Director of the Writing Center, who was coordinating the English faculty for the Summer Bridge program, to teach the English component of Summer Bridge, and  Plaintiff accepted the offer.   After Plaintiff received the standard Adjunct Faculty contract for the semester, she signed and returned it on April 2, 2014, and consistent with the standard process and practice for contract renewal, she and her Department believed she had an employment contract.  But in a stark departure from normal adjunct faculty contract procedure, one of the Defendants -- Barcelo, Trujillo, Padilla or Serna -- instructed Nicole Fresquez of NNMC's human resources department to inform Plaintiff that her summer contract needed approval from a putative "hiring chair" before being approved by Human Resources.   Plaintiff unsuccessfully attempted to find out who this "hiring chair" might be.  It was only much later that Plaintiff learned there is no officially designated position of "hiring chair" at NNMC.

28.     In early May 2014 Defendant Serna, contrary to the existing Collective Bargaining Agreement and Adjunct Faculty procedures; informed Plaintiff that her summer contract was "not fully binding until executed."  Plaintiff's Department Chair Lori Franklin requested clarification and justification for this completely unprecedented development.  Both Plaintiff and her Department Chair Franklin had understood that the contract was already in effect based on both previous contract practice and the written procedures governing such contracts.  The next day, Franklin followed up with a letter to the Board of Regents, President

Barcelo and VP Serna discussing the cancellation of Plaintiff's contract, and implying it was retaliation for Plaintiff's public criticisms of NNMC's financial affairs.

29.     That same day, Defendant Ricky Serna sent Plaintiff an email stating that "she was no longer on the list of approved faculty." NNMC later admitted in writing that no such list existed.

30.     Defendant Ricky Serna orchestrated the cancellation of Plaintiff's contract renewal in retaliation for Plaintiff's protected speech critical of Serna's fiscal management, and her other whistle-blowing activities.

### PLAINTIFF FILES FORMAL GRIEVANCES BUT RECIEVES NO RESPONSE

31.     On May 20, 2014 Plaintiff filed eight separate grievances with NNMC following the procedure set out in the Adjunct Faculty procedures.

32.     On May 22, 2014, Chair Franklin was informed by Defendant Sena that Plaintiff and two others were not approved to teach in Franklin's department.

33.     On June 3, 2014, Chair Franklin found in favor of Plaintiff with respect to the eight filed grievances, stating that she had "complete confidence" in her teaching ability. This was to no avail, however, as by this point Defendants Serna, Sena, and Trujillo had succeeded in forcing her from further employment or participation in the activities of the College.

34.     With her contract not renewed and fearing physical retaliation from Defendants Serna and Padilla, Plaintiff left Rio Arriba County, relocated to the Albuquerque area, where she remained until obtaining professional employment in North Carolina in 2018.

### PLAINTIFF ENGAGES IN PROTECTED SPEECH AS A PRIVATE CITIZEN

35.     In early 2015, Plaintiff created a website focused on exposing improprieties and mismanagement at the NNMC titled "Northern New Mexico College Study Group" and published on the Internet at nnmcstudygroup.org. The website was a volunteer effort, and was

publicly accessible without charge. Plaintiff created content for the website, and also accepted material from other NNMC critics.

36. The website was active and became known as a useful resource for individuals interested in a critical perspective on NNMC. Between March 2015 and September 2015, Plaintiff regularly published content on the website which was critical of NMMC and certain administrators.

37. One article published on nnmcstudygroup.org during this time period documents a $309,000 no-bid contract between the college and a construction company owned by Defendant Ryan Cordova for remodeling of the NNMC bookstore, and accuses Defendants Ryan Cordova, Ricky Serna, Nancy Barcelo, and Brandi Cordova of improprieties in connection with that contract.

38. Plaintiff posted other materials on her website critical of NNMC administrators and their decisions based on the facts detailed throughout this Complaint, and other matters.

39. In or around July 2015, Defendant Ricky Serna, purportedly acting in his official capacity, submitted a demand to Weebly, Inc., the company that hosted nnmcstudygroup.org, to "take down" the website because of alleged violations of NNMC's copyrighted materials.

40. Weebly did in fact take down the website by eliminating its URL (universal resource locator), making it impossible for the site to be accessed by the public on the Internet.

41. The alleged infringing material mostly consisted of photos. Defendant Serna did not contact Plaintiff to discuss the putative copyright infringement prior to engaging in drastic self-help to interfere with Plaintiff's (and other website contributors) speech rights.

42. In fact, none of the material on Plaintiff's website was copyrighted, and Defendant Serna's allegations, signed in his official capacity as Vice President of Institutional

Advancement, were knowingly false.

43.     After making its own investigation, Weebly, Inc. determined that Serna's claims were false and restored the website's accessibility to the public.

**DEFENDANTS' ACTIONABLE RETALIATION**

44.     On March 9, 2015, Defendant Ricky Serna published a comment on the website of the Santa Fe New Mexican newspaper with the following statement:

> The smiley faces go away and the gloves come off when Ms. Rodnguez takes on her alternative personality at NNMCstudygroup, where she tweeted hatred all evening.
>
> I want to publicly go on the record that 1 believe and fear that this small group of angry and viscous [*sic*] people are capable of violence.
>
> Historically and across the nation, acts of violence are common among former employees and students. If yon review facebook posts and tweets associated with NNMCstudygroup and its hatred followers you too will see the writing on the wall.
>
> Posts and tweets include pictures of administrators, their vehicles, and comments that insight [*sic*] violence.

45.     Defendant Ricky Serna's published comment showed that he understood that the nnmcstudygroup.org website was the speech of Plaintiff.   By his published comment, Defendant Serna also publicly falsely accused Plaintiff of inciting anti-social conduct.

46.     Between May 2014 and December 2016, Plaintiff filed multiple requests under the state's Inspection of Public Records Act (IPRA) in an attempt to learn more about her firing, the management of federal grant funds, and various other matters of public concern and interest. As detailed in Count I, the vast majority of Plaintiff's IPRA requests were improperly and unlawfully denied.   Moreover, in the course of Plaintiff's interaction with certain Defendants in connection with her public record requests, Plaintiff was subject to physical intimidation and other conduct in retaliation for her protected speech.

47.      On February 19, 2015 at a scheduled inspection of public records at the College, Plaintiff was approached no fewer than six times by Provost Pedro Martinez while she waited for

records custodian Cordova to arrive, who was late. These approaches had no proper purpose, violated her physical space and created reasonable fear in Plaintiff of further attacks. In the same inspection visit, Plaintiff was also approached by Ricky Serna, who was hostile and accused her of lying on social media.

48. The conduct of administrators Pedro Martinez and Ricky Serna in this early inspection visit communicated to records custodian Brandi Cordova and others that with respect to Plaintiff's records requests, they should disregard the spirit and intent of IPRA. Defendants Martinez and Serna demonstrated that NNMC employees were not to treat Plaintiff's requests as routine duties , but rather that Plaintiff could and should be harassed when exercising her IPRA rights, in retaliation for Plaintiff's criticisms of NNMC administrators, and further, that this harassment and retaliation could include physical intimidation.

49. On information and belief, President Barcelo was aware of and endorsed the policy of subjecting Plaintiff to harassment in connection with Plaintiff's IPRA requests, in retaliation for Plaintiff's critical speech.

50. Shortly after the beginning of a scheduled public records inspection on June 26, 2015, Defendant Brandi Cordova became confrontational and accused Plaintiff of unspecified "inappropriate behavior." Cordova then placed several calls on her cell-phone. Cordova remained in the same office as Plaintiff for her call, but spoke in a whisper such that Plaintiff was unable to hear any part of the conversation. This whispering caused severe apprehension and fear to Plaintiff. Shortly after the calls, four males appeared and loitered at the door outside of the office: Defendants Caetano (assistant basketball coach), Ryan Cordova (basketball coach and husband of Brandi Cordova), Romero (head of Custodial staff), and Waters (NNMC head of security). Brandi Cordova then ordered Plaintiff to leave the room.

51.     Plaintiff reasonably believed that Brandi and Ryan Cordova intended to physically intimidate her, and possibly physically attack her in some way in retaliation for her public statements concerning sole source contracts the Cordovas' construction company had obtained from NNMC.

52.     To exit the room, Plaintiff was forced to run a gauntlet of the four men who had appeared at Ms. Cordova's behest, any one of which on his own would have been extremely intimidating to Plaintiff, who is only five feet tall and was weakened by chronic illness.  At the time of this physical intimidation, Plaintiff was in the midst of a series of chemotherapy treatments for her lupus, which was generally known to Brandi Cordova.

53.     As she exited the office, the four large men surrounded her and partially blocked her path.  She was jostled and prodded as she tried to proceed to the exit of the building.

54.     Defendants Brandi Cordova, Ryan Cordova, Caetano, Romero, and Waters intended to physically intimidate Plaintiff by their conduct and cause her emotional distress.

55.     These actions did cause physical and emotional stress in Plaintiff.  Plaintiff, who was scared and shaken, reported the incident directly afterward at the Espanola Police Department. Officer Danny Pacheco interviewed Plaintiff and took witness' statement. Plaintiff reported the incident to the college in a letter on June 29, 2015.

56.     On information and belief, NNMC possessed video surveillance recording(s) of the June 26, 2015 meeting which it withheld when the recordings were sought by Plaintiff in an IPRA request.

57.     On May 10, 2016, during the course of another duly scheduled records inspection, Defendant Cordova again engaged conduct involving physical intimidation.  After Plaintiff received a half full banker's box, and as she was setting up equipment to scan or photograph the

documents, Defendant Cordova began calling and texting on her cell-phone. Cordova's demeanor then abruptly changed, and rather than allow Plaintiff to inspect the records unmolested, six minutes after the start of the scheduled inspection, Cordova ripped the papers from Plaintiff's hands. Defendant Cordova continued to act in a physically intimidating manner, standing extremely close to Plaintiff, glaring and otherwise using body language to convey hostility. Plaintiff began to fear for her safety. When Cordova approached to less than arm's length distance, Plaintiff feared being hit or slapped.

58. Ten minutes after the inspection began, NNMC Security Guard Hope Vigil appeared, whereupon Plaintiff, fearing for her physical safety, requested a Sheriff's or Police escort off the campus.

59. Defendant Cordova reappeared shortly after, for the apparent purpose of continuing her harassment and intimidation. Cordova was talking loudly and agitatedly, alternatively to her cell-phone communicant and Plaintiff. Security Guard Vigil was doodling and seemed disinterested by the whole encounter, doing nothing to tamp down Cordova's aggressive behavior. Cordova continued her aggressive behavior even after Espanola Police Department Officer Anthony Armijo (No. 844) appeared. The Police Officer escorted Plaintiff to her car.

60. Prior to Plaintiff leaving the campus, Defendant Brandi Cordova caused the Espanola Police to issue a Criminal Trespass notice to Plaintiff stating that she would be subject to arrest if she returned to the NNMC campus.

61. By banning Plaintiff from entering the NNMC campus via an unjustified criminal trespass notice, Defendants NNMC, Brandi Cordova, Rusty Barcelo, Pedro Martinez, and Rick Bailey have caused harm to Plaintiff's academic career and personal humiliation and

embarrassment because her colleagues have invited her to academic events and programs at the College, which she cannot attend. She has also been deprived of participating or attending all public Board meetings (or any other public meetings) held on the campus.

62.     Defendants NNMC, Brandi Cordova, Ryan Cordova, Ricky Serna, Nancy Barcelo, and Anthony Sena's conduct in response to Plaintiff's IPRA requests was retaliation for Plaintiff's speaking out regarding financial mismanagement and other mismanagement by NNMC administrators during the period she was an employee and Plaintiff's further critical speech after she became a private citizen.

### PLAINTIFF BANNED FROM RE-EMPLOYMENT AT NNMC

63.     Despite Plaintiff's conflict with NNMC administrators, the Humanities Department where Plaintiff originally taught wished to rehire her in 2016.

64.     In 2016, Defendant Pedro Martinez, a provost, informed Humanities Chair David Barton that Plaintiff was "banned" from teaching at the College.

65.     On March 23, 2016, Plaintiff sent a letter to Regents describing the new information concerning her continued ban from teaching as stated by Provost Pedro Martinez.

### PRESIDENT BAILEY FAILS TO ACT

66.     On December 29, 2016 Plaintiff, still attempting to salvage her career and avoid litigation, sent a letter detailing the College's stonewalling with respect to records inspection, the physical intimidation, her ban from the campus, and her ban from reemployment to the recently hired President of the College, Defendant Rick Bailey, and the Board of Regents.   President Rick Bailey responded by requesting a meeting with Plaintiff, which occurred on January 7, 2017.  Afterwards, Bailey sent Plaintiff an email thanking her for her time and the great conversation.

67.     During the meeting, Bailey acknowledged Plaintiff's complaints regarding the

College's pattern of IPRA violations, the ban on teaching, and the criminal trespass notice. President Bailey told Plaintiff he would request a "top down review" of these matters.

68. On January 10, 2017, Brandi Cordova sent Plaintiff a letter in response to Plaintiff's December 27, 2016 public records request for the College's IPRA log stating that the College did not keep such a log. On January 13, 2017, Plaintiff forwarded this letter from Brandi Cordova to Defendant President Bailey, with a summary of the issues she and President Bailey discussed during their January 7, 2017 meeting.

69. Plaintiff received another letter on February 1, 2017 from Brandi Cordova, falsely claiming that the records were made available and that they have since been re-shelved and that the College considers the matter and all pending requests closed.

## COUNT I:  IPRA VIOLATIONS

70. The preceding paragraphs are incorporated in to Count I.

71. The Inspection of Public Records Act, NMSA (1978) § 14-2-1 et seq. provides that every person has a right to inspect the public records of public bodies of the State of New Mexico, with limited exceptions for certain confidential materials.

72. NNMC is a public body subject to IPRA.

73. IPRA requires that  "A custodian receiving a written request shall permit the inspection immediately or as soon as is practicable under the circumstances, but not later than fifteen days after receiving a written request.  If the inspection is not permitted within three business days, the custodian shall explain in writing when the records will be available for inspection or when the public body will respond to the request."  NMSA (1978) § 14-2-8(D).

74. An "additional reasonable period of time" is allowed for requests that are excessively burdensome or broad, in which case the "custodian shall provide written notification

to the requester within fifteen days of receipt of the request that additional time will be needed to respond to the written request."  NMSA (1978) § 14-2-10.   "The requester may deem the request denied and may pursue the remedies available pursuant to the Inspection of Public Records Act if the custodian does not permit the records to be inspected in a reasonable period of time."  *Id.*

74.

75.     An inspection request for which no response is received in a reasonable time is deemed denied and subject to the remedies provided by the Act.  NMSA (1978) § 14-2-11.

76.     IPRA provides a private right of action against the public agency for a person whose written requests for public records have been denied.  NMSA (1978) § 14-2-12.

77.     Plaintiff's log of the IPRA requests she submitted and NNMC's response is attached as Exhibit 1, and incorporated by reference into her Amended Complaint.

78.     NNMC unreasonably deemed multiple records requests by Plaintiff to be over-broad or burdensome.

79.     On multiple occasions, when NNMC deemed a request to be over-broad or burdensome, and stated an extended date for its production of records on that basis, NNMC did not produce the records by that date, or ever.

80.     NNMC unreasonably delayed fulfilling multiple records requests by Plaintiff.

81.     Plaintiff made multiple requests under IPRA for which NNMC did not ever make any response.

82.     Plaintiff made multiple requests under IPRA for which NNMC did not ever provide a proper response as required by statute.

83.     Plaintiff made multiple requests under IPRA for which NNMC did not produce records, which on information and belief, NNMC did in fact possess.

84.     NNMC constructively denied Plaintiff her rights to physical inspection of

requested records on three separate occasions.

85.    In several instances, Defendants Ricky Serna and Brandi Cordova, claimed that documents requested by Plaintiff did not exist, despite previously citing these putative documents to justify its actions.  For example, when Plaintiff's employment was terminated, Defendant Serna represented to Plaintiff that she was not on a "approved adjunct faculty list." When Plaintiff requested this list, Defendant Brandi Cordova replied "no such document exists."

86.    NNMC's conduct in not giving required responses to many of Plaintiff's records request, by and through records custodian Brandi Cordova, was intentional and willful.

87.    NNMC's improper withholding of records Plaintiff sought impeded Plaintiff's ability to defend her reputation in her profession against the false accusations made against Plaintiff by multiple Defendants, including Ms. Trujillo, Mr. Martinez, and Mr. Sena, and thereby resulted in lost income.

88.    NNMC's conduct caused Plaintiff actual damages in the form of emotional distress, exacerbation of her physical ailments, attorney fees, and lost income.

### COUNT II:  Deprivation of First Amendment Speech Rights

89.    The preceding paragraphs are incorporated in to Count II.

90.    During her employment with NNMC, Plaintiff spoke out about matters of public interest and concern, including possible mismanagement of federal and other grant funds, and topics of other financial and academic mismanagement.   This speech occurred in various campus settings, including committee meetings, Faculty Senate meetings, other on-campus meetings, and in written communications to top administrators and the Board of Regents.

91.    This speech was not pursuant to her official duties as an instructor.

92.    After the termination of her employment with NNMC, Plaintiff engaged in

protected speech as a non-employee on her website and in written communications to NMMC administrators and Regents regarding misconduct by NNMC administrators.

93.     After the termination of her employment with NNMC, Plaintiff engaged in protected speech as a non-employee by submitting written IPRA requests to NNMC about matters of public import.

94.     Defendants Patricia Trujillo displayed retaliatory animus by unlawfully retaliating against Plaintiff's protected speech by slandering Plaintiff's professional abilities and character within and without the College, in written and oral communications.

95.     Defendant Matthew Martinez displayed retaliatory animus by unlawfully retaliating against Plaintiff's engaging in protected speech by slandering her professional abilities and character within the College in oral communications.

96.     NNMC and Defendants Barcelo, Serna, and Padilla displayed retaliatory animus against Plaintiff's protected speech by terminating her employment as an instructor.

97.     Defendant Pedro Martinez and NNMC unlawfully retaliated against Plaintiff's protected speech by creating or sponsoring the ban on Plaintiff's reemployment in 2016, and by continuing and ratifying the ban thereafter.

98.     Defendant Pedro Martinez unlawfully retaliated against Plaintiff for engaging in protected speech by his physical harassment of Plaintiff during her records inspection in February 2015, and in thereby also communicating to subordinates that physical intimidation of Plaintiff was permissible conduct, leading to escalation in later interactions.

99.     Defendant Brandi Cordova unlawfully retaliated against Plaintiff's protected speech by causing Plaintiff to be subjected to physical intimidation and false charges of criminal trespass that resulted in her being banned from campus.

100. Defendant Ryan Cordova unlawfully retaliated against Plaintiff's protected speech by physically harassing Plaintiff and subjecting her to assault and battery.

101. Defendant Serna unlawfully retaliated against Plaintiff's engaging in protected speech by causing her webhosting provider to take down her website based on false assertion of copyright in 2015.

102. Defendant Serna unlawfully retaliated against Plaintiff's engaging in protected speech by publishing false accusations about Plaintiff in public forums in 2015.

103. Defendant Serna unlawfully retaliated against Plaintiff's engaging in protected speech by encouraging subordinates to harass and physically intimidate Plaintiff while she was seeking to avail herself of her rights to inspect the College's public records in 2015 and 2016.

104. NNMC and Defendants Brandi Cordova, Rusty Barcelo, Pedro Martinez, and Rick Bailey unlawfully retaliated against Plaintiff's engaging in protected speech by banning her from entering the campus without justification.

105. Defendant Rick Bailey unlawfully retaliated against Plaintiff's engaging in protected speech by continuing, upholding, and ratifying the ban on Plaintiff's re-employment, the criminal trespass ban from campus, and the College's aggressive and improper responses to Plaintiff's IPRA requests.

106. Defendant NNMC is liable for the unlawful retaliatory conduct of the Individual Defendants stated herein, who were its employees.

107. Plaintiff has a right of action for Defendant's unlawful conduct under 42 U.S.C. § 1983.

108. Plaintiff suffered substantial emotional distress due to Defendants' unlawful retaliatory conduct.

109. Plaintiff was hospitalized as a result of the exacerbation of her lupus caused by emotional stress that was intentionally created by Defendants.

110. Plaintiff lost income because of the exacerbation of her medical condition caused by Defendants' conduct.

111. Plaintiff lost income because of Defendant's retaliatory conduct in banning her from reemployment at the College in 2016, when her Department believed her to be a qualified and desirable instructor.

112. Plaintiff lost income because of Defendant's retaliatory conduct, which damaged her professional reputation and denied her expected job opportunities in her field.

113. After being forced out of NNMC, Plaintiff has diligently pursued finding other academic employment in her field, commensurate with her credentials and abilities. However, despite having an Ivy League Ph.D., strong letters of recommendation from employers other than NNMC, a suitable publication history, and several awards, Plaintiff was unsuccessful in obtaining anything other than short-term, low-paid positions. In the summer of 2018, she began a postdoctoral fellowship at the University of North Carolina, which is notable for being geographically removed from the Mountain West/Southwest region where Defendants have the most connections and most influence.

114. Although Plaintiff finally obtained post-doctoral professional employment in 2018, her professional earnings ability remains diminished due to Defendants' unlawful conduct, and even if she is able to use the UNC position as a professional firewall, she is four years behind in her career advancement.

**COUNT III - Deprivation of First Amendment Rights of Free Association**

115. The preceding paragraphs are incorporated by reference into Count III.

116.    Defendants NNMC and Brandi Cordova unlawfully deprived Plaintiff of her free association rights under the First Amendment of the United States Constitution and 42 U.S.C. § 1983 by effectively banning her from the College campus with the threat of arrest for criminal trespass if she enters.

117.    Defendants Rusty Barcelo, Ricky Serna, and Ricky Bailey, on information and belief, endorsed and ratified the ban and deprivation of Plaintiff's free association rights.

118.    These Defendants banned Plaintiff from setting foot on the campus based on false allegations of improper or inappropriate conduct while she had been an employee, and when she was attempting to avail herself to her right to inspect public records.

119.    Plaintiff's core area of academic interest is the study of the past immigrant experience in the southwestern United States.  To advance that interest she attends conferences devoted to this topic.

120.    During this time there have been history conferences and other meetings related to her area of interest conducted on the campus that Plaintiff was unable to attend.  This has harmed her career and caused Plaintiff severe emotional stress and harm in the form of shame, embarrassment and perceived opprobrium.

121.    The unlawful deprivation of Plaintiff's rights of free association is an ongoing and continuing harm to Plaintiff, which was ratified again in January 2017 by President Bailey.

122.    Absent action by the Court, Plaintiff will continue to be denied her constitutional right to free association.

### COUNT IV - Deprivation of Due Process Rights

123.    The preceding paragraphs are incorporated by reference into Count IV.

124.    Plaintiff had a property right in her contract for adjunct faculty employment and

under her collective bargaining agreement.  Adjunct contract faculty also have procedural rights under their contract set out in written procedures adopted by the College.

125.     Rather than following the College's procedures for personnel disputes or allegations of misconduct, Defendant Vice President of Institutional Advancement Serna simply made things up as he went along.  When Plaintiff filed formal grievances in an attempt to resolve and improve the contractual relationship and shore up her career, Serna intentionally did not act on them. Further, by claiming that a signed contract was not "fully binding until executed" and alleging a non-existent list of "approved faculty", Defendant Serna and NNMC deprived Plaintiff of her due process rights under the 14th Amendment of the Constitution of the United States and 42 U.S.C. § 1983.

126.     President Bailey in late 2017 constructively ratified and allowed to continue this deprivation by failing to act on the grievances.

## COUNT V - Violation of DMCA

127.     The preceding paragraphs are incorporated by reference into Count V.

128.     The Digital Millennium Copyright Act (DMCA) allows any person to allege to a web hosting company the existence of copyrighted material on a website it is hosting and that continued hosting violates the party's copyright. 17 U.S.C. § 512.  Upon receipt of such a "take down notice," the web hosting company has a legal obligation to inform the owner and creator of the website, and to prevent any further public access to the site by removing the URL from its address routing tables.

129.     It is unlawful for a person to falsely allege facts in a "take down notice."

130.     Defendant Serna violated the DMCA by  falsely alleging that NNMC held copyright to material on Plaintiff's website.

131.     Plaintiff is entitled to her actual damages under the DMCA.

## COUNT VI – Common Law Libel, Slander, and Defamation

132.     The preceding paragraphs are incorporated by reference into Count VI.

133.     Defendants Patricia Trujillo, Matthew Martinez, Ricky Serna, Rusty Barcelo made various public written and oral communications asserting that Plaintiff's conduct was "unprofessional", "inappropriate," "aimed at hurting the college" and "defaming" the College, and that her termination of employment was justified by Plaintiff's own misconduct.

134.     Plaintiff's extended difficulties obtaining new employment is indicative of defamation by one or more Defendants in private communications to persons in Plaintiff's field, continuing through to summer of 2018.

135.     Defendant Ricky Serna published defamatory remarks about Plaintiff in May 2015 on the Santa Fe New Mexican website.

136.     These statements were known to each of these Defendants to be false at the time they made them.

137.     These false statements caused harm to Plaintiff's professional reputation and injured her academic career, resulting in economic losses to Plaintiff.

138.     These statements have caused emotional distress to Plaintiff, which these Defendants intended.

## COUNT VII – Assault and Battery

139.     The preceding paragraphs are incorporated by reference into Count VII.

140.     Defendant Brandi Cordova's conduct during Plaintiff's inspection of public records on June 26, 2015 and May 10, 2016 were intentionally menacing and full of threat and caused Plaintiff fear of physical battery, and therefore constituted assault upon Plaintiff.

141.     Defendant Brandi Cordova's actions placed Plaintiff in reasonable fear and apprehension about being battered or otherwise physically attacked, and resulted in a flare up of her chronic lupus condition, that resulted in a hospitalization.

142.     Defendants Ryan Cordova, Caetano, Waters, and Romero conduct in acting menacingly and blocking Plaintiff's exit on June 26, 2015 was intentional and caused Plaintiff to reasonably fear physical attack.

143.     When Plaintiff attempted to leave the room designated for inspection of public records she did not consent to Ryan Cordova, Mario Caetano, John Waters, or Andy Romero touching her in any way.

144.     Nonetheless these Defendants intentionally touched her person when she was attempting to pass through their gauntlet.

145.     In committing assault and battery against Plaintiff, Defendants Ryan Cordova, Mario Caetano, and Andy Romero were acting outside of the scope of their official duties (basketball coaches and supervisor of custodial staff) and are not entitled to immunity under the New Mexico Tort Claims Act (TCA) or otherwise, or the procedural protections of the TCA.

146.     Plaintiff suffered nominal damages and material emotional distress as a result of these Defendants' assault and battery.

**WHEREFORE**, Plaintiff prays for the following relief:

Compensatory damages for her economic losses, physical injuries, emotional distress, and reputational injuries in an amount to be determined by the trier of fact.  Punitive damages against the individual Defendants for all Counts where authorized by law and specifically for violations of the First Amendment of the United States Constitution, the Digital Millennium Copyright Act of 2005, statutory defamation per NMSA § 41-7-1, and common law Assault,

Battery, Libel, Slander and Defamation; to be determined by the trier of fact. Pre- and post-judgment interest. Statutory and/or actual damages, reasonable attorneys' fees and costs pursuant to 42 U.S.C, §1988, NMSA §§ 14-2-11 and 12, and the common law of New Mexico.

Permanent injunctive relief terminating NNMC's unlawful infringement on Plaintiff's rights to free association and entry on to NNMC's campus. Any and all further relief as the Court deems just and proper.

_____/s/_BRIAN HARRIS_____
Brian Harris
Attorney at law
224 Las Mananitas St.
Santa Fe, NM 87501
505-819-7649
Brianhattorney@gmail.com

Jason Marks
1011 Third Street NW
Albuquerque, NM 87102

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 19day of September, 2018, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Mark E. Komer, Esq.
Long, Komer & Associates, P.A.
Post Office Box 5098
Santa Fe, NM 87502-5098
505-982-8405
mark@longkomer.com
Attorney for Northern New Mexico College and
NNMC Board of Regents

Frank D. Weissbarth
James P. Sullivan
128 East DeVargas
Santa Fe, New Mexico 87501
(505) 995-8514

*Attorneys for Defendant Brandi Cordova, Ryan Cordova and Pedro Martinez,*

By: __/s/___   Brian Harris